J. Todd Kincannon
        (*Subject to Admission Pro Hac Vice*)
THE KINCANNON FIRM
1329 Richland Street
Columbia, South Carolina 29201
Telephone:  877-992-6878
Facsimile:    888-704-2010
*Todd@TheKincannonFirm.com*

Clyde DeWitt
Nevada Bar Number 9791
LAW OFFICES OF CLYDE DEWITT, APC
732 S. Sixth Street, Suite 100
Las Vegas, NV 89101
(702) 386-1756
Fax (310) 362-8667
*clydedewitt@earthlink.net*

Attorneys for *Amicus Curiae*,
Citizens against Litigation Abuse, Inc.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEVADA

# SOUTHERN DIVISION

| | |
|---|---|
| RIGHTHAVEN LLC, a Nevada limited-Liability company, | ) ) Case No: 2:10-cv-01575-JCM-PAL |
| Plaintiff. | ) ) Hon. James C. Mahan, |
| vs. | )    United States District Judge ) ) Hon. Peggy A. Leen |
| PAHRUMP LIFE, an entity of unknown origin and nature; MAREN SCACCIA, an individual; and MICHAEL SCACCIA, an individual, | )    United States Magistrate Judge ) ) **BRIEF OF *AMICUS CURIAE*** |
| Defendants. | ) **CITIZENS AGAINST** ) **LITIGATION ABUSE, INC.** ) ) ) ) |

# TABLE OF CONTENTS

Page #

Table of Authorities ................................................................iii

Introduction ...................................................................... 1

I.  RIGHTHAVEN IS AN UNAUTHORIZED LAW FIRM
ENAGING IN THE UNAUTHORIZED PRACTICE OF LAW.................................. 3

   a.  A Look at form over substance ........................................... 3

   b.  Righthaven's scheme has been tried before  ....................................... 4

   c.  A distinction without a difference  ................................................ 13

II.  RELEVANT NEVADA PRINCIPLES ................................................ 19

III.  CONCLUSION ........................................................... 21

# TABLE OF AUTHORITIES

Page #

## Federal Cases

*Rawlings v. Nat'l Molasses Co.*,
   394 F.2d 645 (9th Cir. 1968) ................................................................ 15

*SGS-Thomson Microelectronics, Inc. v. International Rectifier Corp.*,
   31 F.3d 1177 (Fed. Cir. 1994) ........................................................ 14-15

*Silvers v. Sony Pictures Entertainment*,
   402 F.3d 881 (9th Cir. 2005) ........................................................... 1-2

*Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*,
   944 F.2d 870 (Fed. Cir. 1991) ....................................................... 14-16

## State Cases

*Bay County Bar Ass'n. v. Financiel. Sys., Inc.*,
   345 Mich. 434, 76 N.W.2d 23 (1956) ............................................... 6-7

*Cheyenne Const., Inc. v. Hozz*,
   102 Nev. 308, 720 P.2d 1224 (1986) ................................................ 20

*Credit Bureau*,
   85 N.M. 521, 514 P.2d 40 (1973) ................................................ 16-17

*Hospital Credit Exchange v. Shapiro*,
   186 Misc. 658, 59 N.Y.S.2d 812 (N.Y. Mun. Ct. 1946) ...................... 5-6

*In re Discipline of Lerner*,
   197 P.3d 1067 (Nev. 2008) ............................................................. 19

*Iowa Supreme Court Comm'n. on Unauthorized Practice
   of Law v. A-1 Associates Ltd.*,
   623 N.W.2d 803 (Ia. 2001).......................................................... 11-12

*Nelson v. Smith*,
   107 Utah 382, 154 P.2d 634 ............................................................ 4-5

*Pioneer Title Ins. & Trust Co. v. State Bar of Nevada*,
   74 Nev. 186, 326 P.2d 408 (1958) ................................................... 19

*Roberts v. LaConey,*
   375 S.C. 97, 650 S.E.2d 474 (2007) ............................................................... 12-13

*State ex rel. Frieson v. Isner,*
   168 W.Va. 758, 285 S.E.2d 641 (1981) ......................................................... 10-11

*State ex rel. Norvell v. Credit Bureau of Albuquerque, Inc.,*
   85 N.M. 521, 514 P.2d 40 (1973) .................................................................... 8-10

*State ex rel. State Bar of Wis. v. Bonded Collections, Inc.,*
   36 Wis.2d 643, 154 N.W.2d 250 (1967) ............................................................... 7

## **Statutes, Codes and Rules**

NEV. REV. STAT. 49.095 .......................................................................................... 20-21

NEV. R. PROF. COND. 1.5(b) ......................................................................................... 20

NEV. R. PROF. COND. 5.4(d) ......................................................................................... 18

NEV. R. PROF. COND. 5.5(b) ......................................................................................... 21

## **Miscellaneous**

*http://en.wikipedia.org/wiki/Righthaven*

# ***AMICUS CURIAE* BRIEF**

## ***Introduction***

Righthaven, LLC ("Righthaven"), the brainchild of Las Vegas attorney Steven Gibson ("Gibson"), is a notorious "copyright troll."[1] When it began its lawsuit campaign, its lawyers worked hard to accomplish two goals: first, to convince defendants that it was the assignee of the copyrights at issue; and, second, to keep anyone from ever seeing its contracts with its clients. That strategy worked for a while; but it eventually failed. Righthaven's so-called "Strategic Alliance Agreement" ("SAA") with Stephens Media, LLC (publisher of, *inter alia*, the *Las Vegas Review-Journal*) was unsealed on April 15, 2011 by Hon. Roger L. Hunt of this court in *Righthaven v. Democratic Underground*, No. 2:10-cv-01356-RLH–GWF.

Debate over the legal effect of the "SAA" began immediately; and flaws in the agreement quickly became evident. For one, it was clear that Righthaven's rights were purely illusory and that the attempted legal effect of the assignment was to transfer to Righthaven the "bare right to sue." But, under *Silvers v. Sony Pictures Entertainment*, 402 F.3d 881 (9th Cir. 2005) and similar cases, attempting to assign the bare right to sue over copyright infringement actually assigns nothing, because the Copyright Act does not allow it.

*Silvers* is well reasoned and most certainly forecloses Righthaven's strategy,

---

[1]    *http://en.wikipedia.org/wiki/Righthaven*

even under the "amended" SAA, as Judge Pro concluded in *Righthaven v. Hoehn*, 2:10-cv-01356-RLH-GWF in this court, and Judge Hunt suggested in *dicta* in *Righthaven v. Democratic Underground*. But Righthaven has signaled that it will continue its blunderbuss approach until it finds some language that does not run afoul of the *Silvers* rule. Righthaven's new strategy is to draw tenuous analogies with patent law in the hopes of obtaining an advisory ruling as to exactly how it needs to adapt its agreements. Its efforts, however, can never succeed.

In addition, Righthaven has now disclosed – having failed to do so previously – that its clients have a financial interest in the litigation it brings. Righthaven has listed Stephens Media LLC, the owner of the *Las Vegas Review-Journal*, as a financially interested party in all cases arising from the posting of *Review-Journal* material.[2]  Likewise, MediaNews Group, Inc., the owner of *The Denver Post*, has been disclosed as a financially interested party in those Righthaven cases. "Financially interested party" means that if Righthaven obtains a judgment, Stephens Media or MediaNews Group receives a percentage of any recovery.

Based on that, the Righthaven cases no longer need to be decided according to the dictates of intellectual property law. There is now a profoundly deeper problem

---

[2]    The SAA indicates Stephens Media is entitled to 50% of the proceeds from those cases)

with the Righthaven scheme, one so fundamental that no amount of rewriting can solve it. *Amicus* Citizens against Litigation Abuse therefore respectfully submits the following:

## I.

## RIGHTHAVEN IS AN UNAUTHORIZED LAW FIRM

## ENGAGING IN THE UNAUTHORIZED PRACTICE OF LAW

### a.    *A look at form over substance.*

The court should ignore the entire Righthaven enterprise for a moment and consider the following general proposition: Assume that a company has an actionable claim against someone. The company wants to hire someone to pursue a lawsuit over the claim. Accordingly, the company makes a deal with a firm that employs lawyers and handles lawsuits to do just that. In fact, prosecuting lawsuits is all the firm does.

The company and the firm strike the following arrangement: the firm will prosecute the company's actionable claim; and the firm and the company will split any recovery, after expenses, 50/50. In the real world, that arrangement is called a "contingency fee representation agreement," the "company" is the client, and the "firm" is a law firm.

But Righthaven does not appear to operate in the real world. Righthaven claims this exact arrangement is actually an "assignment;" and that it is not a law

firm but, rather, a "copyright enforcer"[3] and that its clients are not clients but are "key relationships." That is nothing but corporate doublespeak, deployed in an attempt to camouflage an arrangement that is totally impermissible outside of the context of a lawyer-client relationship.

Moreover, Righthaven claims to be engaged in a novel pursuit presenting new and undecided issues in copyright enforcement. Those claims are accurate only so long as one does not consider precedents relating to the unauthorized practice of law. What Righthaven tries to present as some inventive new way of enforcing copyrights is nothing more than a copyright-specific form of a scheme that has been rejected, so far as *Amicus* can determine, by every court that has ever examined it.

> ### b.      Righthaven's scheme has been tried before.

Righthaven is by no means the first entity to obtain an assignment of a claim, file a lawsuit in its own name, and then kick back a portion of any recovery to the assignor. The assignment-lawsuit-kickback scheme was rejected during World War II, just as it should be now. In *Nelson v. Smith*, 107 Utah 382, 154 P.2d 634 (1944), the Utah Supreme Court held as follows:

> "When the defendants solicit the placement of claims with them for collection, they are asking third parties to allow them to render the service of collecting the claim. At that time the collection agency has absolutely no interest, either legal or beneficial, in the claim. The only interest they ever get comes by virtue of a promise to prosecute the

---

[3]      In fact, Righthaven's web site holds it out as "The Nation's Pre-Eminent Copyright Enforcer."

claim. Courts cannot remain blind to the fact that the assignment of the claim to the defendants for collection is not made as a gratuity. The percentage of the amount collected which is allowed to the defendants is given to them for one purpose only; to compensate them for services rendered in the collection thereof. Where the collection practice involves the preparing of legal papers, furnishing legal advice and other legal services, the compensation allowed must be assumed to be in part allowed to pay for the legal services so rendered. No matter how one looks at it, this constitutes the rendering of legal services for others as a regular part of a business carried on for financial gain. This essential fact cannot be hidden by the subterfuge of an assignment. The assignment itself, if used to permit this practice, is for an illegal purpose. . . . The taking of an assignment under circumstances such as those detailed above cannot possibly change the essential fact that the defendants are rendering legal services for another for gain."

*Id.* 154 P.2d at 639-40.

That is *exactly* what Righthaven is doing; and no amount of "documentation" can change it. Righthaven's assignments are absolutely for the purpose of permitting it, a non-law firm, to practice law; and, as the Utah Supreme Court said nearly seventy years ago, that essential fact cannot be hidden by the subterfuge of an assignment. Such an "assignment" is not an assignment; it is a contingency fee representation agreement.

But the assignment-lawsuit-kickback scheme did not end there. Two years later, the City of New York had a run-in with a would-be Righthaven, dressed up as a charitable organization. The Hospital Credit Exchange was a collection agency that solicited causes of action from New York's charitable hospitals. *Hospital Credit Exchange v. Shapiro*, 186 Misc. 658, 59 N.Y.S.2d 812, 813-14 (N.Y. Mun. Ct. 1946). The Credit Exchange took "assignments of these claims for the sole and express purpose of instituting suit thereon in its own name although in behalf of such hospitals." *Id.*, 59 N.Y.S.2d at 814. The Credit Exchange used its own lawyers to

handle the claims. *Id.* The Credit Exchange would then take whatever recoveries it obtained and divide them between it and the assignor. *Id.*

The New York court found the Credit Exchange "engaged in the practice of law contrary to public policy and in violation of the Penal Law." *Id.* at 814. The court refused to allow the sham, stating, "Not so easily is the law circumvented which prevents collection agencies from carrying on a legal practice." *Id.* at 816. Foreshadowing Righthaven, the court went on:

> "This might be very good business for the officials of a closely managed collection agency, who could thus grant themselves very satisfactory compensation for conducting what is tantamount to a law practice. It is not necessary that such compensation take the form of dividends or a distribution of profits; it may be paid in salaries or commissions."

*Id.*, 59 N.Y.S. at 816-17.

A decade after New York's rejection of the assignment-lawsuit-kickback scheme, the Michigan Supreme Court found itself faced with yet another proto-Righthaven, another collection agency taking assignments of claims and bringing suits in its own name in which the assignors retained an interest. *Bay County Bar Ass'n. v. Financiel Sys., Inc.*, 345 Mich. 434, 76 N.W.2d 23 (1956). The Michigan Supreme Court found the assignment-lawsuit-kickback scheme to be the unauthorized practice of law. *Id.*

The Michigan Supreme court could not "escape the conclusion" that the taking assignments and filing suits in the assignee's name in which assignors retain an interest was the practice of law. *Id.* at 29. And, just as in New York, it did not matter that the assignee used licensed attorneys to file the suits. *Id.* The assignee itself had

to be authorized to practice law, *i.e.* a lawyer or a law firm. *Id.*

"When this is done by one not licensed as an attorney it constitutes the unauthorized practice of law whether done by him in person or through his agent, regardless of whether the latter be a laymen or a licensed attorney." *Id.* "The corporate defendant has engaged in the unlawful practice [of law]." *Id.* Righthaven's use of lawyers is therefore no insulation to these arguments.

Another decade passed and someone attempted the assignment-lawsuit-kickback scheme in Wisconsin. The Wisconsin Supreme Court flatly rejected it, stating:

> "It is sheer hypocrisy to conclude that the percentage retained by the collection agency represents its equity or ownership share of the claim. It is its fee or charge for professional services rendered. Under these circumstances the property right of the creditor is directly affected and his recovery is dependent upon the litigation undertaken. There is no doubt that the client whose interests must be served and represented in the suit for collection under a normal and lawful lawyer-client relationship is the creditor."

*State ex rel. State Bar of Wis. v. Bonded Collections, Inc.*, 36 Wis.2d 643, 154 N.W.2d 250, 256 (1967). The Wisconsin Supreme Court went on to say, in no uncertain terms: "The collection agency by going into court representing itself as the client perpetrates a fraud on the court." *Id.*

And the Wisconsin Supreme Court, as had its counterparts in New York and Michigan, found that the collection agency in that case was practicing law even though it hired a lawyer to go to court:

> "The fact that the defendants in some instances employ a regularly licensed attorney to prepare necessary legal papers and conduct the trial of a suit does not make their conduct legal. One cannot do through an employee or an agent that which he cannot do by himself. If the attorney

is in fact the agent or employee of the lay agency, his acts are the acts of his principal or master. When an attorney represents an individual or corporation, he acts as a servant or agent. Since he acts for others in a representative capacity, doing those things which are customarily done by an attorney, he practices law[.]"

*Id.* Again, Righthaven's use of lawyers to prosecute its claims is no defense to these arguments.

Just four years later in New Mexico, the Credit Bureau of Albuquerque decided to try the Righthaven path to prosperity. In *State ex rel. Norvell v. Credit Bureau of Albuquerque, Inc.*, 85 N.M. 521, 514 P.2d 40 (1973), the Credit Bureau took claims for enforcement under a contingency fee agreement with the creditor. *Id.* The agreement also "require[d] the creditor to assign his claim to the Credit Bureau when requested to do so." *Id.*

If pre-suit collection failed, the Credit Bureau then obtained an "assignment of the claim for the purpose of allowing the Credit Bureau to file suit in its own name." *Id.* The Credit Bureau did not pay for the assignment; it just assumed the claim in its own name with the contingency fee agreement still in place. *Id.* The Credit Bureau then filed lawsuits, and if a judgment was collected in such a suit, the creditor-assignor would receive the agreed percentage. *Id.* at 44.

After apparently employing these tactics for some time, the Credit Bureau finally crossed the wrong person. One David Norvelle was targeted by the Credit Bureau; and his lawyer realized the scheme was not debt collection but the unauthorized practice of law. After this revelation, it appears victims of the Credit Bureau came out of the woodwork and attempted to intervene; and so did the New

Mexico Attorney General. *Id.* at 42.

The New Mexico Supreme Court held that the Credit Bureau was engaged in the unauthorized practice of law: "[C]ollection agencies as a part of their business of serving others, clearly should not be permitted to prepare legal papers, commence suits, appear in court, prepare judgments and generally manage law suits for its various customers." *Id.* at 45. "It does not matter what particular form or name they give their procedure the practice of furnishing or performing legal services for another is essentially the same." *Id.*

The *Credit Bureau* court then quoted extensively from *Nelson v. Smith* before concluding:

> "Such a business conducted for the purpose of bringing legal actions on claims owned by third parties and consisting of the payment of all costs and the furnishing of all legal services incident to the bringing of the actions is the practice of law. Where, as here, the agency rendering the service is a lay agency, it is the illegal practice of law. Such is the almost uniform holding of the authorities as applied to collection agencies operating along similar lines."

*Id.* at 45-46 (Citations and internal quotes omitted).

The New Mexico Supreme Court went on:

> "And so with the right of a plaintiff to try his own lawsuit in any court. If it is really his own litigation the right is unquestioned and unquestionable. But if it is another's lawsuit or action, placed in plaintiff's name so as to enable him to render service to that other under the pretext of trying his own case, it does not come under the protection of the rule. And if it is done by one who engages in it as a business and holds himself out as peculiarly qualified or equipped, it comes under the ban of illegal practice of law."

*Id.* at 47 (Internal quotes omitted).

Righthaven, as noted above, holds itself out as "The Nation's Pre-Eminent Copyright Enforcer." This would seem to satisfy the "peculiarly qualified or

equipped" requirements. And, just as in the Righthaven cases, "The assignments procured by the Credit Bureau were not in truth taken for the purpose of acquiring title and ownership, but rather to facilitate the furnishing of legal services for a consideration." *Id.* at 49. The unending theme of these cases is that an entity pursuing the Righthaven assignment-lawsuit-kickback scheme is entering into sham documents and committing a fraud on the court.

It would appear based on studying the precedents that, every few years, in some state or another, someone manufactures an assignment-lawsuit-kickback scheme anew, and it never meets with success. In *State ex rel. Frieson v. Isner*, 168 W.Va. 758, 285 S.E.2d 641 (1981), yet another collection agency gave the Righthaven scheme a try. The West Virginia Supreme Court was not pleased:

> "The operation of a collection agency, in and of itself, does not constitute the unauthorized practice of law. . . . Where, however, a person, association or corporation which collects debts as a regular business attempts to enforce the claims of others by resort to legal proceedings, the debt collector is extending his or its business to include legal representation of creditors. The collection agency is holding itself out not only as an entity which will collect amounts owed to creditors but also as an agent which will render legal services in order to recover debts. It sells its services as a representative in legal actions as part and parcel of its debt collection business. Such activity can be viewed in no other light than as the unauthorized practice of law.

> \* \* \*

> "The Associated Collection Agencies of West Virginia suggest in their *amicus curiae* brief, however, that South Charleston Adjustment Bureau was not rendering legal services to the petitioner's creditors as a part of its debt collection business, but rather had obtained an assignment of the claims from the creditors and was asserting its own claim. . . . The association argues that because the collection agency is asserting its own claim as assignee rather than acting as a representative of the creditor-assignor, it does not violate the prohibition against laymen engaging in the unauthorized practice of law.

> "Generally an unsettled account or debt due is a chose in action which is assignable, and by virtue of statute the assignee may sue in his own

1
2
3
4

name to recover the debt. . . . Where, however, a collection agency takes an assignment of a creditor's claim solely for the purpose of enabling the agency to maintain suit thereon, numerous jurisdictions have held that the fact that the collection agency, as assignee, is the real party in interest by virtue of the assignment and entitled to maintain suit in its own name is not determinative of the question of whether in so doing the collection agency is engaging in the practice of law."

5   *Id.*, 285 S.E.2d at 650-51.

6
7
8
9
10
11

Delivering the final nail in the coffin of the Righthaven scheme in West Virginia, the Supreme Court held, "In such instances the assignment has been held to be a sham or fraud perpetrated upon the court to allow the collection agency to avoid the prohibition on the unauthorized practice of law." *Id.* at 651.

12
13
14
15
16
17
18
19
20

The Iowa Supreme Court had a run in with the Righthaven scheme just ten years ago. In *Iowa Supreme Court Comm'n. on Unauthorized Practice of Law v. A-1 Associates Ltd.*, 623 N.W.2d 803 (Ia. 2001), the Iowa Supreme Court found that an entity (other than a law firm) "engages in the unauthorized practice of law when, as a regular part of its business, it procures or takes assignments for collection where the creditor still retains an interest in the underlying debt and the collection agency institutes and maintains legal action to recover the unpaid debt." Id. at 805.

21
22
23
24
25

The Iowa Supreme Court rejected the idea that such a legal relationship between a creditor and a debt collector is an "assignment." *Id.* at 807. "[W]e are convinced that A-1's practices are not consistent with the ordinary meaning of assignment recognized at common law and by statute." *Id.* The court went on:

26
27
28

"The assignment form executed by A-1's clients purports to transfer absolutely all right, title, and interest in described accounts receivable owned by A-1's clients. If such instrument actually meant what it said, it would come within the ordinary meaning of assignment – a transfer of the assignor's entire interest or rights in the property. And it would

plainly give A-1 the right to maintain an action on the debt in its own name and represent itself in court on a pro se basis if it chose to do so." *Id.* at 808 (Citations omitted).

But the Iowa Supreme Court rejected the assignment as a sham. "A-1's claimed status as a bona fide assignee is defeated under this record, however, because the assignment – though absolute in form – is, in fact, a transfer intended primarily to secure payment for services rendered." *Id.* Righthaven does not dispute that its right of recovery from its cases is primarily intended to secure payment for services rendered, *i.e.*, "copyright enforcement." Righthaven's clients do not enter into assignments. They enter into contingency fee representation agreements for legal services.

Finally, just four years ago, the South Carolina Supreme Court encountered the assignment-lawsuit-kickback scheme. In *Roberts v. LaConey*, 375 S.C. 97, 650 S.E.2d 474 (2007), a debt collector approached creditors to sign an assignment of the claim to him. *Id.*, 650 S.E.2d at 476. He would attempt to collect the debt for a fee of one-third of the recovery. *Id.* The debt collector used various legal mechanisms to attempt to compel payment, including asserting that the claim was now his to pursue *pro se* and accordingly appearing in court. *See generally, Id.* The South Carolina Supreme Court was as unimpressed with the assignment-lawsuit-kickback scheme as the other courts cited above; and in fact the South Carolina Supreme Court held the assignment to be in actuality a contingency fee representation agreement for legal services with an individual who was not a lawyer. *Id.* at 478-79. The court was

particularly condemning towards the practice, referring to it as "sheer hypocrisy," a "fraud on the court," and a "sham perpetrated on the court to enable unauthorized practice of law." *Id.* (citing *Bonded Collections*, *supra*; *Frieson v. Isner*, *supra*). Further, the South Carolina Supreme Court indicated that in such a situation, the collection agent had no genuine title, equity, or ownership in the claim. *Id.* at 478 (citing *Bonded Collections*, *supra*; *Credit Bureau*, *supra*).

The previously cited cases are factually identical to the Righthaven situation. Further analysis is almost redundant. Each of the businesses and individuals associated with the assignment-lawsuit-kickback scheme operated *identically* to Righthaven. Every one of the foregoing courts would find Righthaven to be an unauthorized law firm engaged in the unauthorized practice of law on behalf of its media clients.

### c.   A distinction without a difference.

Righthaven claims that there is something different about copyright law (and patent law) that allows it to operate the way it does. However, nothing in the preceding citations in any way discloses that the rule should be different based on the nature of the claim. A claim is a claim. Taking an assignment of someone's claim, filing suit over it and then giving that someone a share of the recovery is a contingency-fee lawyer agreement; it is not an "enforcer" as Righthaven calls it.

Worse for Righthaven, courts do not just view this as a form of contractual overreaching as a court might view an overly-broad covenant not to compete. An "assignment" of this nature, as best *Amicus* can discern, is treated everywhere as a fraud on the court and a sham to enable unauthorized practice of law. Such an assignment actually transfers no rights whatsoever, because it is illegal and against public policy *ab initio*.

Righthaven's Omnibus Response repeatedly argues that the purpose of a transaction is irrelevant, that the Court should just accept Righthaven's claim to title – backed up by self-serving documents – and move on. For this proposition, Righthaven cites an unpublished case, *SGS-Thomson Microelectronics, Inc. v. International Rectifier Corp.*, 31 F.3d 1177 (Fed. Cir. 1994), and *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870 (Fed. Cir. 1991) (also involving American Trim Products, Inc.).

The first point to be made is a very simple one. Consider the names of the parties in these cases: SGS-Thomson Microelectronics, International Rectifier Corporation, Vaupel Textilmaschinen KG, Meccanica Euro Italia SPA, and American Trim Products. The first two are *bona fide* electronics companies and the last three are *bona fide* textile companies. These five companies are in the business of business, not the business of litigation.

Examining each case demonstrates facts and circumstances far removed from the Righthaven cases. In *SGS-Thomson*, the court found that the assignments at issue

were not shams because no party put in any evidence of a sham. *Id.* at *5. Further, the assignments were purchased for value – $10,000. *Id.* No party presented the *SGS-Thomson* court with the argument that the underlying suit was being prosecuted by a law firm in disguise. *See generally*, *Id.* The absence of this argument was not because of bad lawyering; but, rather, because it clearly was not the case. Both parties in *SGS-Thomson* were bona fide participants in the electronics business. This case stands as no defense to *Amicus'* arguments presented above.

The *SGS-Thomson* court cites *Rawlings v. Nat'l Molasses Co.*, 394 F.2d 645, 684 (9th Cir. 1968), to which Righthaven also points. In that case, the Ninth Circuit encountered joint owners of a patent who learned of infringement. One wanted to sue the infringer and one did not. *Id.* at 647-48. The owner not wishing to engage in litigation assigned its rights to its co-owner, who proceeded with litigation. *Id.* at 648. The assignment was not in the nature of the forbidden "assignment-lawsuit-kickback," nor was the assignee in the business of engaging in these sorts of transactions. *See generally*, *id.* It was a one-time transaction made between *bona fide* owners and clearly not done to enable the assignee to practice law without being a lawyer or law firm. *Id.* Again, no one raised that issue in the case because it wasn't an issue in the case.

The other case Righthaven claims for support is *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870 (1991). But the *Vaupel* case is no better for Righthaven, as Vaupel was actually using a patent as a licensee when it

discovered infringement. *See generally*, *Id.* The essential facts are as follows: Vaupel's original license contemplated enforcement of the patent approximately 10 years before discovering any infringement. *Id.* The original license indicated the patentee and Vaupel would work together on a case-by-case basis to determine whether to sue over infringements that might crop up in the future. *Id.* at 875.

After an infringement was discovered, the patentee and Vaupel agreed upon an assignment so that Vaupel could pursue the litigation, with Vaupel to receive a portion of the proceeds. *Id.* Again, the key difference between that case and Righthaven is this: Vaupel was not in the business of litigation. Vaupel and the patentee had a *bona fide* business relationship and arranged their affairs so as to defend against a mutual enemy. No one argued that Vaupel was engaged in the unauthorized practice of law, and there was no *scheme* of assignment-lawsuit-kickback. The arrangement was made for mutual business benefit, not so that Vaupel could earn fees off of litigation pursued for a client.

The cases Righthaven cites certainly support the proposition that courts will not ordinarily police a patent assignment made between real businesses; but that has never been in question. If the *Washington Post* purchased all of the *Las Vegas Review-Journal's* assets and proceeded to file infringement cases, the Righthaven defendants would need to find a different basis for defense. But turning back briefly to the unauthorized practice cases, the key in each was the habitual nature of the conduct – that it was a pattern and practice. In *Credit Bureau*, 85 N.M. 521, 514 P.2d

40 (1973), the court said:

> "[I]f it is another's lawsuit or action, placed in plaintiff's name so as to enable him to render service to that other under the pretext of trying his own case, it does not come under the protection of the rule [that a plaintiff can sue in his own name]. And if it is done by one who engages in it as a business and holds himself out as peculiarly qualified or equipped, it comes under the ban of illegal practice of law."

*Id.* 514 P.,2d at 47 (quotations omitted).

The New Mexico Supreme Court clearly intended to exempt *bona fide* business transactions from the reach of its prohibition, as it should have. And it can be said with certainty that not one of the courts prohibiting assignment-lawsuit-kickback *schemes* would have looked askew at *isolated*, *bona fide* business transactions in that form. There are countless hypothetical scenarios where an isolated transaction in the prohibited form might be upheld.

For example, suppose a young couple is looking at purchasing a nice house on very inexpensive land; but before any papers are signed, the house burns down due to a neighbor's negligence. The owner has long since moved, and has little interest or ability to pursue litigation. The couple still likes the lot and would rebuild; but it is unable to obtain financing because the house is now gone.

So, the couple and the owner come to an agreement: The owner assigns all right, title, and interest in the property to the couple who hire a lawyer and pursue the litigation in their own name. The couple agrees to give the litigation proceeds back to the owner, keeping the lot for their time and trouble, where they now intend to build a house.

No court would condemn such a transaction, even though it involves an assignment, a lawsuit by the assignee, and a return of proceeds to the assignor. The couple is clearly not in the business of pursuing these sorts of transactions, taking a fee for their work, and remitting the remainder to the assignor.

What permanently tips the scales against Righthaven is nothing that any documentation or amended assignments can ever undo. Righthaven is in the business of seeking out claims held by others, suing people over them, and returning litigation proceeds – minus costs and a fee – to the original claimant. That is fundamentally the practice of law, and a business entity that is not a law firm simply cannot do it. Righthaven's scheme is irredeemable.

Righthaven is not a law firm. It does not hold itself out as a law firm, but as a business doing "copyright enforcement." It sues in its own name, not in the name of its clients. And it has non-lawyer investors, something forbidden by the rules of professional conduct in every American jurisdiction.[4] Those facts pose a permanent and fatal bar to Righthaven's continued operation.

Righthaven's contention is that a court may never look beyond the four corners of a copyright assignment to determine whether the document is a sham or a fraud on the court. This contention flies directly in the face of the court's primary purpose, the search for the truth. As described above, it is black letter law that a court may investigate an assignment to see if it is a cover for the unauthorized practice of

---

[4]        *E.g.*, NEV. R. PROF. COND. 5.4(d).

law, even where the assignee prosecutes its cases with licensed attorneys. That is *exactly* the situation here.

Consider a world where Righthaven's scheme is legitimate. Every law school in the country should close its doors, and every state bar should begin winding up its affairs. Anyone who is not a licensed practitioner can strike a deal with anyone holding an actionable claim: "Has someone injured you? Damaged your property? Call the Abe Jackson Assignment Firm at 1-800-GET-CASH. Assign Abe your claims. We handle the lawsuit, and we give you two-thirds of the recovery! Over 20 years practicing assignment in state and federal court. We don't get paid unless you get paid!" It is not an exaggeration to say that this imaginary ad is *precisely* Righthaven's *modus operandi*.


## II.

## RELEVANT NEVADA PRINCIPLES

In Nevada, "what constitutes the practice of law must be determined on a case-by-case basis," giving due consideration to the law of other states. *In re Discipline of Lerner*, 197 P.3d 1067, 1071 (Nev. 2008). The purpose of the prohibition of the unauthorized practice of law is clear:

> "The public interest therefore requires that in the securing of professional advice and assistance upon matters affecting one's legal rights one must have assurance of competence and integrity and must enjoy freedom of full disclosure with complete confidence in the undivided allegiance of one's counsellor in the definition and assertion of the rights in question."

*Pioneer Title Ins. & Trust Co. v. State Bar of Nevada*, 74 Nev. 186, 189-90, 326 P.2d 408 (1958).

Plainly, the professional advice was coming from Righthaven, which is not a law firm.  True, the initiation of the advice was from Gibson, an attorney; but it was filtered through Righthaven.  Because Righthaven is not answerable to the Bar, what it is doing is at odds with the above principles.

Nevada, like everywhere else, has rules about fees charged by attorneys. Nev. R. Prof. Cond. 1.5(b).  Nothing in those rules provides for dividing a contingency fee with a client that, in turn, divides it with the party who is the ultimate injured party. What transpires with Righthaven is this: The injured party, Stephens Media, retains Righthaven to recover damages for the infringement of its copyrights. Stephens Media hires a member of the Bar to sue on a contingency ***for Righthaven***. There is no attorney-client relationship with the party that in fact was injured, Stephens Media.

What of attorney-client confidences?  Stephens Media talks to Righthaven; Righthaven talks to Attorney Gibson.  By talking to Righthaven, a non-law-firm, Stephens Media has waived attorney-client confidentiality.  *See Cheyenne Const., Inc. v. Hozz*, 102 Nev. 308, 311-12, 720 P.2d 1224 (1986)("If there is disclosure of privileged communications, this waives the remainder of the privileged consultation on the same subject.")  Stephens Media has no attorney-client relationship with Gibson. Stephens Media certainly would be alarmed to learn of the fact that every

communication between anyone at Stephens Media and Gibson is entirely discoverable – emails, telephone calls, letters – everything.  That entire circumstance certainly is an affront to the legislative objective of the very important statutory attorney-client privilege. NEV. REV. STAT. 49.095.

Finally, Righthaven plainly does not fall within any of the exceptions to the rules pertaining to the unauthorized practice of law found in the applicable rule. NEV. R. PROF. COND. 5.5(b).

**III.**

**CONCLUSION**

*Amicus* requests this Court specifically find Righthaven lacks standing because the "assignment" is actually a contingency fee representation agreement for legal services. Righthaven is not a law firm and therefore cannot provide legal services, and under no circumstances does it have standing to bring this claim in its own name. A ruling on this basis will give clarity and finality to all parties, including Righthaven. Given Righthaven's expressed intention to keep tinkering with its assignments until it finds magic words that keep it in court, a ruling on this basis would save inordinate amounts of judicial resources and the resources of the parties, again including Righthaven.

\\\

\\\

Additionally, such a ruling would give Righthaven the guidance it claims to seek as to how copyright claims can be pursued by third-party copyright enforcers. Such a practice is perfectly legitimate when such claims are brought by bona fide law firms representing bona fide clients. *Amicus* Citizens against Litigation Abuse respectfully requests this Honorable Court so find – for everyone's benefit, including Righthaven's.

Dated: June 27, 2011.                          Respectfully Submitted,

J. TODD KINCANNON
   (*Subject to Admission Pro Hac Vice*)
THE KINCANNON FIRM

CLYDE DeWITT
LAW OFFICES OF CLYDE DeWITT, APC


By: ___/s/ Clyde DeWitt_____
         Clyde DeWitt

Counsel for *Amicus Curiae*,
Citizens against Litigation Abuse, Inc.