1            UNITED STATES DISTRICT COURT

2              DISTRICT OF NEVADA

3     THE HONORABLE JAMES C. MAHAN, JUDGE PRESIDING

4

5

6   RIGHTHAVEN, LLC,

7            Plaintiff,

8   vs.                         NO. 2:10-CV-1575-JCM-PAL

9   PAHRUMP LIFE, et al.,        MOTION HEARING

10           Defendants.
   _____/

11

12

13            REPORTER'S TRANSCRIPT OF PROCEEDINGS

14              WEDNESDAY, JULY 27, 2011

15                  10:00 A.M.

16

17

18   APPEARANCES:

19   For the Plaintiff:     SHAWN MANGANO, ESQ.
                            DALE CENDALI, ESQ.

20   For the Defendants:    LAURENCE F. PULGRAM, ESQ.
                            CLYDE DeWITT, ESQ.

21                          J. MALCOLM DeVOY, ESQ.

22   Amicus Curiae:         PROFESSOR JASON SCHULTZ

23

24

25   Reported by:  Joy Garner, CCR 275
                   Official Federal Court Reporter

```
 1        LAS VEGAS, NEVADA, WEDNESDAY, JULY 27, 2011
 2                      10:00 A.M.
 3                    *    *    *
 4               P R O C E E D I N G S
 5
 6        THE CLERK:  This is the time set for
 7   the show cause hearing and plaintiff's motion to
 8   amend or correct complaint, Civil Case Number
 9   2:10-CV-1575-JCM-PAL; Righthaven, LLC versus
10   Pahrump Life, and all others.
11                  Counsel, please note your
12   appearance for the record.
13        THE COURT:  Mr. Mangano.
14        MR. MANGANO:  Good morning, your Honor,
15   Shawn Mangano on behalf of Righthaven.
16        THE COURT:  Thank you.
17        MR. MANGANO:  With me is Dale Cendali
18   who has been admitted pro hac vice.
19        MS. CENDALI:  Thank you, your Honor.
20        THE COURT:  Cendali, is that right?
21        MS. CENDALI:  That's right, your Honor.
22        THE COURT:  Thank you.  All right.
23        MR. PULGRAM:  Good morning, your Honor,
24   for Amicus Democratic Underground, Laurence
25   Pulgram of the law firm of Fenwick and West.
```

```
1    With me is Curt Apsal (phonetic) of the
2    Electronic Frontier Foundation.
3              THE COURT:  Yes, sir.
4              MR. SCHULTZ:  Good morning, your Honor,
5    Jason Schultz.  I'm one of the amici as well.
6              MR. DeWITT:  Good morning, your Honor,
7    Clyde DeWitt for Citizens Against Litigation
8    Abuse, Amicus Curiae.  We were allowed to appear
9    based on your order of June 29th.
10             MR. DEVOY:  Good morning, your Honor,
11   J. Malcolm DeVoy of Randazza Legal Group here on
12   behalf of Amicus Media Bloggers Association
13   pursuant to this Court's order.  Thank you.
14             THE COURT:  Yes, sir.  And those of you
15   who have appeared in front of me before know that
16   I welcome the amicus people.  And I want to hear
17   other voices I guess and not to say, well, let's
18   not have a hearing, we'll just decide it on the
19   papers, or whatever.  I always like to give
20   everybody a chance to be heard.  I was going to
21   say something, but if you want to say something
22   first, go ahead.
23             MR. MANGANO:  No.  Go ahead, your
24   Honor.
25             THE COURT:  I've reviewed this with my
```

1   brain trust.  Let me tell you what I'm inclined

2   to do and I'll give everybody a chance to argue.

3                    Righthaven has been involved in

4   litigation with, you know, in this building, you

5   know, where other judges have decided cases, you

6   know, which are interesting but not necessarily

7   controlling on my thinking.  So as I look at

8   this, though, to cut right to the heart of the

9   matter, and it's kind of a procedural thing, but

10  I don't think Righthaven has standing based on

11  Lujan versus Defenders of Wildlife, 504 U.S. 555

12  at 571.  In footnote 4 it says, the existence of

13  federal jurisdiction ordinarily depends on the

14  facts as they exist when the complaint is filed.

15                    And then there is a follow-up

16  case, which I have somewhere here in my

17  paperwork, Newman-Green versus Alfonzo-Larrain,

18  490 U.S. 826, 109 S.Ct. 2218.  The existence of

19  federal jurisdiction ordinarily -- this is Roman

20  numeral number II in the opinion -- let's see,

21  it's page 2222 of the Supreme Court Reporter and

22  488 of -- no, I'm sorry, it's at page 2222 of the

23  Supreme Court Reporter.

24                    The existence of federal

25  jurisdiction ordinarily depends on the facts as

1    they exist when the complaint is filed.  And then
2    it notes there are two exceptions, the defective
3    under Title 28 USC, Section 1653, defective
4    allegations of jurisdiction may be amended upon
5    terms in the trial of appellate court, and that
6    is to say it again, defective allegations of
7    jurisdiction which suggests that it addresses
8    only incorrect statements about jurisdiction that
9    actually exist and not the affects of the
10   jurisdictional facts themselves.
11             And then the second exception is
12   Rule 21 which has since been amended, but anyway
13   this case where it has been interpreted by the
14   Second Circuit in Herrick, H-E-R-R-I-C-K,
15   Company, Inc. versus SCS Communications, Inc.,
16   251 F.3d, 315 at 329, Second Circuit, a 2001
17   case.  And it says, quote, as a result where the
18   facts necessary to the establishment of diversity
19   jurisdiction are subsequently determined to have
20   obtained all along, a federal court may simply
21   allow a complaint to be amended to assert those
22   necessary facts.  And again the allegations that
23   need to be corrected, then we can correct the
24   allegations, and then treat diversity
25   jurisdictions having existed from the beginning,

1  but no such amendment is possible when the

2  underlying facts (and not merely the pleadings)

3  are inadequate to support federal jurisdiction.

4  For curing jurisdiction in such a circumstance

5  requires more than just changing the pleadings.

6                    And the facts here are that, and

7  now I'm going to rely on other decisions as well,

8  but as other courts have found, you know, there

9  was no federal jurisdiction under the agreement

10  with Stephens Media.  So what I'm inclined to do

11  is to dismiss the case based on lack of

12  jurisdiction.  Now I'll be glad to hear whatever

13  people have to say.

14            MS. CENDALI:  Your Honor, may I take

15  the podium?

16            THE COURT:  Yes, ma'am, sure.

17            MS. CENDALI:  Thank you.

18                    First off, thank you, your

19  Honor, for granting my pro hac petition and for

20  letting me be here today.

21            THE COURT:  Ms. Cendali, put your right

22  hand on the slant and find the button on the

23  slant.  That's how you adjust the microphone.  So

24  that's your tax dollars at work.  So hit the

25  button again and it will go down.

1          MS. CENDALI:  Does that seem the best
2    angle there?
3          THE COURT:  I think so.
4          MS. CENDALI:  All right, thank you very
5    much.  I had a similar problem once at the United
6    States Supreme Court, and Judge Scalia suggested
7    I lower the podium to the maximum extent possible
8    so I think I'll do the same here today.
9          THE COURT:  Oh, all right, that's fine.
10          MS. CENDALI:  In any case, your Honor,
11    Righthaven does have standing today with regard
12    to the restated and amended Strategic Alliance
13    Agreement.  No court has construed that
14    agreement.  That agreement is on all fours with
15    the Silvers case in the Ninth Circuit.  It is not
16    a bare right to sue but fully grants the right to
17    Righthaven in all rights to the copyrights at
18    issue in this case including the right to sue.
19          THE COURT:  You speaking now of the
20    amendment, is that right?
21          MS. CENDALI:  That's right.
22          THE COURT:  Okay, but we go by the
23    facts as they existed at the time the lawsuit was
24    filed.
25          MS. CENDALI:  So let's focus on that.

1   Your point is that in the Lujan case you need to

2   look at the facts as they existed at the time the

3   complaint was filed.  Well, we have cited cases

4   which our opponents have not tried to distinguish

5   such as --

6              THE COURT:  Oh, just wait, just wait.

7              MS. CENDALI:  Well, such as Valmont,

8   Travelers, Gallans, Novende (all phonetic), all

9   of which accepted post filing facts as giving

10   rise to standing.  And those courts, and I think

11   the Northstar decision in the Northern District

12   of California, a 2011 decision, is particularly

13   helpful and say that --

14              THE COURT:  So you're saying I should

15   follow the Northern District of California rather

16   than the Supreme Court?

17              MS. CENDALI:  No.  The difference is

18   you have to read the rule that, of course, we're

19   not arguing that standing is not to be considered

20   at the time the complaint is filed, but almost

21   all of those cases, and as far as I know all of

22   the cases that have discussed this, have not also

23   dealt with the issue of a motion for leave to

24   amend to supplement the pleadings to plead the

25   new jurisdictional facts.

```
 1                    In fact, the Haddad (phonetic)
 2   case in the Second Circuit specifically noted
 3   that while a lot of cases cite the old saw that
 4   you need to look at the facts at the time the
 5   complaint was filed, they don't deal with the
 6   more sophisticated issue of when you have a
 7   motion for leave to amend in light of subsequent
 8   events.
 9             THE COURT:  But I mean the facts have
10   changed?
11             MS. CENDALI:  Yes, the facts have
12   changed, fundamentally have changed.  The
13   business agreement that was originally entered
14   into is no longer the same business agreement
15   that it is today and what the Northstar case in
16   the -- in the --
17             THE COURT:  But I mean what Supreme
18   Court cases say is that allegations, you can
19   change allegations, but you can't -- you can
20   amend, well, where you want additional
21   allegations, but not where you want to change the
22   facts.
23             MS. CENDALI:  But the issue is how you
24   reconcile that with the issue of a motion for
25   leave to amend which we've liberally granted.
```

1    Again in the Northstar case, it discusses the
2    fact that there the argument, similar to what's
3    being made here by the amici, is that, well, it's
4    too late because we looked at what happened on
5    the day of the original filing, that's all you
6    looked at.
7                 And the court said that this
8    argument elevates form over substance and goes on
9    to say that although there's no published Ninth
10   Circuit authority on this point, courts in other
11   circuits have found that parties may cure
12   standing deficiencies through supplemental
13   pleadings.  And thus, because in that case there
14   was a subsequent assignment that cured in that
15   case the admitted lack of existing standing
16   originally, because there was that subsequent
17   assignment, the court said, I'm going to deny the
18   motion for -- the motion to dismiss and permit
19   the supplemental pleading.
20                 And the court did this for a
21   very practical reason because the alternative, as
22   we know, standing is a jurisdictional issue with
23   dismissal without prejudice.  The complaint can
24   be re-filed tomorrow based on the new restated
25   and amended Strategic Alliance Agreement which

1   has never been viewed by any court, and we would

2   end up delayed but in the same position we are in

3   now, and the courts recognize why go through that

4   as a matter of judicial economy.  Isn't it

5   practical under Rule 15 to permit an amendment?

6   There's relation back under Rule 15, let it amend

7   back, relate back, to the original filing and

8   let's get on with it.

9                    There's already been an answer

10  filed.  Let's get to the merits and we'd very

11  much like to get to the merits, your Honor.  So

12  our point is that there is a line of cases.

13  Northstar I thought was helpful because it's

14  2011, and it summarized a lot of the law.

15  There's a line of cases that say, yes, absolutely

16  you need to look at standing at the time of

17  filing, but you also need to read that in

18  conjunction with subsequent facts and a motion

19  for supplemental pleading.

20                    And in light of those cases and

21  in light of the practicality, it makes more sense

22  we respectfully submit to accept the

23  supplemental -- or grant our motion for leave to

24  amend and let the case proceed to the merits

25  phase because alternatively your Honor will

```
 1   dismiss without prejudice which is the rule and
 2   we'll be re-filing, and it will just take that
 3   much longer to get to the actual merits of the
 4   copyright infringement here.
 5                     Thank you.
 6           THE COURT:  All right.  Opposition?
 7           MR. PULGRAM:  Thank you, your Honor.
 8           THE COURT:  Yes, sir.  Mr. Pulgram?
 9           MR. PULGRAM:  Yes, sir.
10           THE COURT:  Yes.
11           MR. PULGRAM:  Thank you for allowing
12   the amici to appear because this is an important
13   issue and the particular issue that you have is a
14   slightly progressed version of what has come
15   before the other courts here.  Your Honor is
16   exactly correct that the case should be dismissed
17   for lack of standing under the Lujan line of
18   cases and five cases in this jurisdiction have so
19   held.  Those aren't binding on your Honor as
20   precedent, but we do believe and we'll talk about
21   in a moment about whether they are collateral
22   estoppel.
23                     Second, all of those cases have
24   held, as your Honor is stating, that when they
25   not manufacture facts to create jurisdiction,
```

1  that was the language used by Judge Dawson in the

2  Mostofi case, which is a final judgment in which

3  he said, plaintiffs and Stephens Media attempt to

4  impermissibly amend the facts to manufacture

5  standing.  That just doesn't work as a matter of

6  federal practice.  And I think the argument being

7  made here is twofold on the part of plaintiffs.

8              First, we would like to amend

9  even though we can't, and if you don't let us,

10 we'll have to sue again.  And our position, your

11 Honor, is that this is not after a finding that

12 there was no standing because there was no

13 ownership of the copyright.  That is not going to

14 be a dismissal without prejudice and, in fact,

15 those cases that have already dismissed on the

16 basis of lack of ownership of Righthaven, all of

17 which are the five cases before yours, all of

18 those cases also have preclusive effect here, and

19 let me explain if I may.

20             In the typical situation of a

21 copyright case there are two elements that need

22 to be shown, ownership of a copyright and a

23 copyright.  The element of ownership is an

24 element of the claim.  Now, in addition, the

25 element of ownership is an element of standing.

1   And so when Judge Hunt, Judge Dawson, Judge Pro

2   concluded there was no ownership under the SAA in

3   Righthaven, they concluded that an element of the

4   claim of copyright is missing.

5            THE COURT:  And just for the record,

6   SAA is the Strategic Alliance Agreement for the

7   record, but go ahead.

8            MR. PULGRAM:  I'm sorry to use the

9   jargon but exactly right, and that was the

10  agreement that existed at the beginning of this

11  case and, Judge, in the Hoehn case Judge Pro even

12  went on to say that the clarification so-called

13  did not create an ownership interest.  Now it

14  has, therefore, been settled that under the SAA

15  there is no ownership interest in Righthaven and

16  that isn't --

17           THE COURT:  But they respond what about

18  this second -- I'm going to use the wrong

19  terminology -- but the second amendment, if you

20  will, to the Strategic Alliance Agreement?

21           MR. PULGRAM:  So we have --

22           THE COURT:  And understand what I'm

23  saying, I'm saying, okay, I understand these

24  other judges ruled against Righthaven, but now

25  with the second amendment to the Strategic

```
 1   Alliance Agreement, that cures all of that.
 2          MR. PULGRAM:  And the answer to that
 3   is, it does not because it has already been
 4   concluded that under the Strategic Alliance
 5   Agreement whether you amend it later or not,
 6   under the Strategic Alliance Agreement there is
 7   no ownership.  You cannot after a judgment of a
 8   court, of which there have been four saying that
 9   this is no ownership, come back, change the facts
10   and avoid preclusive effect.
11              And I think there are two cases
12   that I would like to provide to your Honor and
13   your brain trust on this point because we
14   received yesterday a brief at 6:58 in the morning
15   that for the first time addressed this question
16   of collateral estoppel.  We briefed the issue in
17   our June 27th brief.  We got their first brief on
18   this yesterday and, if I may, I'll hand you
19   copies of the cases.
20          THE COURT:  Sure, yes, sir.  Have you
21   provided --
22          MS. CENDALI:  They provided it moments
23   ago, your Honor.
24          THE COURT:  Well, this case I think we
25   originally set for hearing back in May I think,
```

1   and somebody wants to file something and, like I

2   say, it's my preference is I want to hear more

3   rather than less so --

4           MR. PULGRAM:  These are two multiple

5   copies of two cases.

6           THE COURT:  Okay.

7           MR. PULGRAM:  And I did provide them as

8   soon we got copies from Kinko's this morning

9   before the hearing, but the first case is a case

10  out of the Northern District of Illinois, Judge

11  Shadur, and it was affirmed in the Seventh

12  Circuit.  And the place to start is the very last

13  page which is his first decision.

14              And the last paragraph says

15  because Hyperquest is not an exclusive licensee

16  of any of the rights that it now claims, it is

17  without standing to bring the current action.

18  Accordingly both the complaint and this action

19  are dismissed for lack of subject matter

20  jurisdiction.  So just like all the courts and

21  your Honor can find no ownership, no exclusive

22  rights, no standing, to dismiss this, and he

23  calls it lack of subject matter jurisdiction.

24              If you turn to the second page

25  of this, he explains because one of the parties

1    said, Judge, that was a dismissal without

2    prejudice, that was just subject matter

3    jurisdiction.  And in the bottom right-hand

4    corner, he explains, no, that was with prejudice,

5    and I'll read that paragraph.

6              THE COURT:  Yes, sir.

7              MR. PULGRAM:  By sharp contrast, what

8    was at issue in this case was not subject matter

9    jurisdiction in the real sense, but rather the

10   standing, or more accurately the lack of

11   standing, of Hyperquest to file suit in a case in

12   which, one, a copyright indisputably existed and;

13   two, this court had ample power to decide all

14   issues of that copyright's validity and its

15   claimed infringement.  And then he says, in the

16   order, this court rejected HQ's litigative effort

17   definitively and with prejudice because of its

18   lack of standing, not because of the absence of

19   power of subject matter jurisdiction.

20              And so what Judge Shadur said

21   and what the Seventh Circuit said is, I dismissed

22   it because there was no ownership of an exclusive

23   right.  I called it lack of jurisdiction, but

24   it's the part of jurisdiction standing that is

25   about justiciability not about power and,

1    therefore, it's a dismissal with prejudice.  And

2    that's why, your Honor, those decisions by the

3    other courts have collateral estoppel effect

4    here, and it's why your Honor when you dismiss

5    because the SAA has no -- has no ownership

6    interest in Righthaven, it should be a dismissal

7    with prejudice.

8                    Now, the plaintiffs argue we

9    just want to re-file with this new restated

10   agreement and that's where the second case that I

11   handed you, the Penonia (phonetic) case, comes

12   in.  The plaintiffs have in their brief yesterday

13   cited a lot of cases that say a dismissal for

14   lack of jurisdiction, a dismissal just for lack

15   of jurisdiction, is not collateral estoppel.  So

16   all that Judge Hunt and Judge Mahan decided was

17   there was no jurisdiction because we didn't own

18   the copyright, that's not collateral estoppel.

19                   They cited a lot of cases for

20   that proposition, none of which dealt with

21   ownerships of copyrights, not any, and none of

22   which dealt with this case, the situation where

23   the merits are intertwined with standing,

24   intertwined with jurisdiction, and what the

25   Penonia Farms case shows is that where a court

1   has dismissed a claim based on lack of ownership,

2   that is collateral estoppel, and I would direct

3   the point to the -- the court to the third of the

4   pages of this decision, the paragraph ending

5   two-thirds down on the right-hand side.

6              THE COURT:  I was looking at the head

7   notes.  I'm sorry, the first page?

8              MR. PULGRAM:  On the third page.

9              THE COURT:  On the third page, I'm

10  sorry, let me catch up to you.  Oh, on the

11  right-hand side, yes, sir.

12             MR. PULGRAM:  Right.  At the bottom of

13  that paragraph there is a sentence that begins

14  about seven lines up, the bottom of the last full

15  paragraph.  This court finds that the Southern

16  District of New York Federal Court thoroughly

17  investigated the effect of the 1990 settlement

18  agreement in Penonia Farm's ownership interest in

19  Penonia One, reconsidered the issue in Penonia

20  Two.  Therefore, a court of competent

21  jurisdiction did actually and necessarily

22  determine the standing issue, thus satisfying the

23  second prong of the Yamaha test, and the Yamaha

24  test is the test for issue preclusion.  So what

25  we have is a decision because it decided

1   ownership that is preclusive.

2                THE COURT:  But their response is,

3   well, we've amended the Strategic Alliance

4   Agreement, now we do have ownership.

5                MR. PULGRAM:  That's right.

6                THE COURT:  And no court has addressed

7   that.

8                MR. PULGRAM:  That's exactly what they

9   say, your Honor, and they say pay no attention to

10  the fact that the agreement that was litigated on

11  which we sued has been conclusively determined to

12  not grant standing.  We are changing nunc pro

13  tunc what happened in the last year-and-a-half,

14  and I know Judge Hunt said, I know Judge Hunt

15  ruled, and I know the DiBiasi decision entered

16  judgment that, quote, the plain language of the

17  SAA conveys the intent to deprive Righthaven of

18  any right save for the right to sue alleged

19  infringers and profits from such lawsuits.

20                I know that's what has been

21  decided to be what happened in this case, but

22  we're changing all of that now.  We're coming in

23  after a judgment was entered, after preclusive

24  effect has been obtained, and we're now creating

25  a new set of facts.  And we want to sue on it,

```
1    and we want to sue on the same SAA, the exact
2    same contract.  We're just restating it because
3    we get, when we don't like the decision that has
4    come down in a prior case, to paper over it by
5    changing the language of the contract.
6              THE COURT:  But I mean parties can
7    amend their agreements any time they want to.
8              MR. PULGRAM:  They sure can.
9              THE COURT:  And so here we've got
10   this -- if I can call it the Strategic Alliance
11   Agreement One, Strategic Alliance Agreement Two,
12   and by my count, and you bicker with me and say,
13   no, it's three, or two, or whatever, but now it
14   looks like the third incarnation of the Strategic
15   Alliance Agreement.
16             MR. PULGRAM:  That's right.
17             THE COURT:  No judge has determined
18   this Strategic Alliance Agreement doesn't confer
19   ownership, or I mean there's just no judge has
20   addressed that, no court has addressed that.
21             MR. PULGRAM:  No court has determined
22   whether or not if this had been the original
23   Strategic Alliance Agreement, it could have
24   created ownership, but the courts are not time
25   travelers, and I would respectfully suggest that
```

```
 1   my esteemed New York counsel isn't either such
 2   that they can go back to the time that the SAA
 3   was entered and decide I know there's been a
 4   final adjudication, but the intent was to give
 5   Righthaven nothing.
 6                    We're changing that after the
 7   fact.  We are undoing -- we're undoing the rule
 8   on what the SAA meet and we're -- because we can
 9   because we want to nunc pro tunc say the
10   opposite.  The Strategic Alliance Agreement issue
11   number three, version number three says, recites,
12   that it is the intention of the parties -- that
13   it was the intention of the parties that
14   Righthaven receive all rights of an ownership and
15   the copyright.  It's been decided exactly the
16   opposite that that's not what the SAA did.
17                    And so if you come in after the
18   fact and you try to rewrite an agreement to
19   create a claim that has already been denied,
20   that's undoing the courts' decisions.  And I
21   think it goes back to the question of what is
22   collateral estoppel issue preclusion about?  And
23   the Supreme Court has made that pretty clear in
24   explaining that the doctrine is invoked by the
25   courts to promote conclusive resolution of
```

1   disputes.

2                    I'm quoting here from Montana

3   versus United States, 440 U.S. 147 at 153.  The

4   doctrine is invoked by the courts to promote

5   conclusive resolution of the disputes thereby

6   protecting parties from the expense of multiple

7   lawsuits, conserving judicial resources, and

8   increasing the reliability and consistency of

9   judicial decisions.  That's exactly why we should

10  only have one adjudication about the SAA in this

11  case and that's exactly why the plaintiffs can't

12  come in after that.

13                    We cited the FM Industries case

14  for the proposition that a party cannot simply

15  amend its agreement to get around a judgment.

16  It's not been responded to by the plaintiffs, and

17  that court specifically was a copyright case

18  where the parties came in after the judgment and

19  they asked for relief.  I think it was under Rule

20  59 or 60, and the court said, no, I'm not going

21  to allow you to change my judgment by rewriting

22  the agreement.  And that's what's happening here.

23                    Now, that's why the procedure

24  says this case is over.  There are other reasons

25  why the substance of the restated agreement

1    couldn't amount to a claim anyway, and I believe

2    that is sufficiently before the Court.  Our

3    procedural position is that your Honor shouldn't

4    allow them in because Lujan prohibits it and

5    because all of these other cases were decisions

6    on the merits.

7                    If you get past that issue, then

8    we're talking about whether or not this restated

9    agreement is real and whether it's something that

10   could be amended, and our position is that it is

11   not.  And our position is that, in fact, this is

12   further propagating or perpetuating the fraud on

13   the court that Judge Hunt explained in his

14   sanctions order.  I don't know if you've had a

15   chance to read it, but it was two weeks ago and

16   he ordered it delivered to every other court in

17   this jurisdiction and in Colorado that had these

18   issues.

19                    The new agreement contradicts in

20   its recitation of intent the express findings

21   that Judge Hunt has made.  It contradicts the

22   prior agreements.  The prior agreements said that

23   after Righthaven was to be given so-called

24   exclusive rights, it was going to license back

25   all-exclusive rights.  That was the SAA.  The

1    first amendment, the so-called clarification

2    said, when we said that the license back to

3    Stephens Media was exclusive, we didn't really

4    mean that.  We meant that it was nonexclusive,

5    and they inserted the word "non" and then they

6    said, but Stephens Media has a right to veto any

7    further license or use by Righthaven.

8                    And once Judge Pro rejected that

9    in the Hoehn case, they said, oh, third

10   clarification, now the nonexclusive license back

11   to Stephens Media doesn't have Stephens Media

12   with the right to veto anymore.  So the point is

13   that each of these agreements are just

14   contradictory.  They are not statements of true

15   intent.  They are not what the parties agreed to

16   or were doing.  They are efforts above all else

17   to create some status, some possible patina for a

18   claim, and that's not a basis upon which a new

19   claim can be made here.

20                    I would just add that the

21   restated amendment also contradicts history.  For

22   the last eighteen months, Righthaven has acted

23   exclusively as an agent to sue people.  The

24   restated agreement purports on its face to say

25   during those eighteen months, that was not its

1  status, it was an actual licensee with a right to

2  license people.  And, in fact, we have before

3  your Court, your Honor, a copy of the LLC

4  Operating Agreement for Righthaven, and even that

5  says that its job is to sue people, and at the

6  end of those lawsuits the copyrights will, must,

7  be given back to the party who gave them.

8                    The restated agreement would

9  just perpetuate the very fraud for which they

10  were sanctioned, and for that reason even if you

11  assume that there was any basis under Lujan and

12  under collateral estoppel rules that it could be

13  added, even if you assume that, it's not a basis

14  upon which a claim could be made now in this case

15  or in the future.

16                    You know, it was interesting to

17  me to read the brief that we received yesterday

18  morning which said that the defendants in this

19  case or my law firm is interested in creating a

20  copyright free zone on the Internet.

21              THE COURT:  A copyright free zone?

22              MR. PULGRAM:  A copyright free zone was

23  the rhetoric, and what's also interesting is that

24  every case that is brought by Righthaven that has

25  gotten to the question of infringement has been

1    lost by Righthaven.  Every single case in which

2    there's been a determination of whether there's

3    infringement or not, at least three have come out

4    at summary judgment to the contrary.

5                    What we are defending, your

6    Honor, what the amici are here about is to

7    establish a shakedown free zone where real

8    lawsuits are filed by real parties who have real

9    grievances and real ownership interest and not by

10   people who can easily file hundreds of actions

11   against the unrepresented, against people who

12   have to go out to get pro bono counsel all over

13   the country in an effort to shakedown nuisance

14   settlements.

15                    That's why we're here and we

16   think that your Honor has before you all the

17   facts to do exactly what you started with today

18   to dismiss this case, to dismiss it with

19   prejudice, and to end this lawsuit by this party

20   under this agreement, the SAA restated or not,

21   against this defendant.

22            THE COURT:  All right.  Thank you, Mr.

23   Pulgram.

24            MS. CENDALI:  Your Honor, may I respond

25   to this, please?

1          THE COURT:  No, you'll get a chance to
2   respond at the end.  I've got another hearing
3   that started twelve minutes ago.
4          MR. PULGRAM:  I apologize, your Honor.
5          THE COURT:  No, no, I mean it just so
6   happens this got continued so often that I wanted
7   to get it on calendar as quickly as possible.
8                    Professor, good to see you
9   again.
10         PROFESSOR SCHULTZ:  Good to see you,
11  thank you, your Honor.  I'll try and keep this
12  brief as well.  I want to just add two points in
13  trying to focus a little bit more on copyright
14  policy and the Copyright Act and the Silvers
15  decision because I think from the sort of big
16  picture point of view, I want to make sure that
17  what happens here is consistent for all the
18  cases, not just Righthaven cases, but all
19  copyright cases.
20                  So I want to start with one
21  solid reason why it might make sense to dismiss
22  this case and not allow amendment, and that is
23  that one important policy that's in the Copyright
24  Act is that when you have a prevailing party,
25  attorney's fees are available and costs.  And

1  that's something that is used quite often on both

2  sides, both the copyright plaintiffs to get fees

3  when they win and defendants when they win.

4              And, in fact, you know it's

5  certainly one of the things that is at issue here

6  in a lot of these cases, and so one of the things

7  that I think I saw going on with these amendments

8  was that there's sort of this language about

9  restatement clarification, but I think I agree

10 with you, your Honor, that in some ways it's not

11 a do-over.  It's not like they are trying to do

12 the same thing over and over, but yet a series

13 like, you know, you make a movie, and then a

14 sequel, and then a third one, and you're sort of

15 trying to get it, you know, kind of down the

16 road.

17             And it actually makes a

18 substantive difference, all right, because if you

19 don't have a valid copyright claim when you file

20 your complaint, then you are subject to fees and

21 costs if you lose and the defendant wins.  And so

22 I think in Section 505 of the Copyright Act,

23 which clearly states that a prevailing party is

24 eligible for fees and costs, that's an important

25 policy that actually would back up a reason for

1 | dismissing the case is not just allowing
2 | perpetual amendments.
3 |         The second point that I would
4 | like to make is to actually take a look at the
5 | Silvers case a little closer as to a few
6 | different places where the Ninth Circuit talked
7 | about why the rule they instituted was important
8 | and actually talked about why Congress passed
9 | Section 501(b) specifically in the statute
10 | because I think it's easy on some level to say
11 | that maybe this new agreement, if you read
12 | specific words in it, meets the single line
13 | holding in Silvers.
14 |         But I actually don't think
15 | that's true when you look at what the agreement
16 | is really trying to do and also what Silvers is
17 | trying to do, what the Ninth Circuit en banc
18 | decision was trying to do because actually what
19 | was interesting to me is how little discussion of
20 | Silvers there was in detail in the plaintiff's
21 | briefing, and I just wanted to highlight a couple
22 | of things that I find there.
23 |         First is that there's an
24 | explicit statement that the Copyright Act does
25 | not permit copyright parties to choose third

 1   parties to sue on their behalf, and in that
 2   specific instance it was that there was an
 3   assignment of the bare right to sue.  So the
 4   screen writer in Silvers who, you know, the
 5   writer had claimed that the movie was copied from
 6   her writings.  She got a bare right to sue, and
 7   the court said, no, that you don't have standing,
 8   but the reason was for this fundamental principle
 9   that you can't outsource your enforcement, and
10   that the court talks about the kind of history of
11   who could sue.
12            And I don't want to go into a
13   lecture, but let me just focus on one area which
14   is that originally actually under the 1909
15   Copyright Act, not only did the copyright owner
16   have to be the one who sued, but you couldn't
17   even split up a copyright.  There are lots of
18   different parts of a copyright you can have
19   exclusive rights to reproduce, to distribute, to
20   perform publically a song, or a movie, or
21   something like those little pieces of it, a
22   bundle of sticks as they say in law school,
23   right?
24            And in the 1976 Act, Congress
25   amended it to say actually, okay, we're going to

1 allow you to split that up, but the reason they

2 did it, and Silvers says this explicitly, was

3 because Congress is aware of constraints on

4 commercial dealings, that there were certain

5 kinds of exploitations of the copyright.  Say you

6 wrote a book and someone wanted to make a movie

7 of it, and you wanted to license or give them the

8 rights to do that exclusively over here, but then

9 someone wants to do an audio book over here, and

10 you want to do it a different thing, you are able

11 to split it up in order to kind of exploit the

12 copyright to make more works available, to make

13 money off of it, and that the enforcement that's

14 written into Section 501(b) is to back that up,

15 right, it's to allow people who go out and do

16 business to back it up.

17            So I just wanted to kind of

18 highlight that because when I look at the

19 amendments here, again this is -- I don't mean to

20 sort of, you know, harp on the same point, but it

21 even though in theory they say that Righthaven

22 has this right to exploit the copyright, there's

23 no indication that they're doing anything of that

24 sort that this is really about litigation, and so

25 I wanted to just sort of focus on the Silvers

1   case in those two respects because I think if the

2   Court were -- I agree actually that there might

3   be a number of procedural issues in Lujan and all

4   these other cases.

5                    But if the Court even does get

6   to this new agreement, I think the Silvers case

7   actually talks more broadly about why this right

8   to sue needs to be really held by the same people

9   exploiting the copyright and not allowed to

10   wander and the copyright to become fragmented.

11   And that's really what Congress's purpose was, so

12   that aligned with the attorney's fees provision,

13   I think are two additional reasons why I agree

14   with your Honor, and I think the decision can

15   focus in the instructions.  So thank you.

16                THE COURT:  All right, thank you.

17                     Mr. DeWitt?

18                MR. DeWITT:  Good morning, your Honor.

19                THE COURT:  Good morning.

20                MR. DeWITT:  As I said, I represent an

21   organization called Citizens Against Lawsuit

22   Abuse, and at their request the single issue I

23   have written on is that Righthaven is a law firm

24   engaged in the unauthorized practice of law.

25   There's only two points I want to make because my

```
 1    other counsel here are much more esteemed than I
 2    am.
 3                    One is I think just for the
 4    public, you need to write an opinion in this case
 5    and publish it, and I think it's very, very
 6    important to the Scaccias and the other ones of
 7    the world against whom Righthaven is engineering
 8    stickup after stickup after stickup.  And the
 9    second point is it's very important this case be
10    dismissed with prejudice both for the claim
11    preclusion, issue preclusion, reasons that my
12    co-counsel has addressed so well, and because if
13    you dismiss it without prejudice, the defendants
14    don't have the resources to appeal.
15                    They don't know how to do this
16    and they don't even have a lawyer.  And so what's
17    going to happen if assuming the Ninth Circuit as
18    I'm confident it would upholds your ruling, then
19    it will just be another stickup.  And it is so
20    important to get to the prejudice issue because
21    just a matter of public policy and a matter of
22    fairness to the defendants in this case and,
23    goodness knows, how many other defendants.
24                    I'm not going to go into what I
25    put in my brief about why it's a law firm engaged
```

1  in the unauthorized practice of law, but I can

2  only make -- there's two points that are

3  important.  One thing that is in my brief, the

4  attorneys represent Righthaven.  Righthaven

5  represents Stephens Media.  Okay, Stephens Media

6  goes to Righthaven and talks to them about the

7  cases.  It's not a privileged communication.

8  Righthaven isn't a lawyer, it doesn't claim to be

9  even though it's a law firm in fact.

10              And as to all these Strategic

11  Alliance Agreements, the Court needs to look at

12  substance over form.  If you put a duck in a

13  chicken suit, it's still a duck.  And I mean they

14  can write clever language in a Strategic Alliance

15  Agreement, which I'm sure they'll have ten more

16  amendments to in response to the Court's response

17  to what they're doing, but it's not what the

18  agreement says, it's what's really going on.

19              And what's really going on is

20  Righthaven is a law firm.  It's engaged in the

21  unauthorized practice of law, and it's very

22  important that the Court find that and give the

23  Ninth Circuit a chance to agree with you, which

24  I'm confident that it will for the reasons that

25  are in my brief.  Every state that's addressed

1  this has come to that conclusion, and the cases

2  are all in there.  Otherwise, my esteemed

3  colleagues are doing better than I am, so I'll

4  let them talk.

5        THE COURT:  All right.  Thank you, sir.

6              Mr. Devoy?

7        MR. DEVOY:  Thank you, your Honor.

8        THE COURT:  Yes, sir.

9        MR. DEVOY:  I will be brief.  Recapping

10  what my colleagues have said, I'm specifically

11  addressing the Court's need to not allow

12  Righthaven to have leave to amend its brief.

13  Specifically doing so would be futile.  First of

14  all, it is moot because Righthaven does not have

15  standing and there is no way that amending its

16  complaint will simply cure that.  It cannot go

17  back in time and change this with another

18  amendment to an agreement that has already been

19  found to not confer its standing from a

20  standpoint of justiciability.

21              What Righthaven has done the

22  first time is to put -- to have in its agreement,

23  and now by restating it again, it's put a beard

24  on it as Mr. DeWitt pointed out, and as

25  Righthaven somewhat hypocritically points out by

1   arguing about form over substance, Righthaven's

2   relationship with Stephens Media and its lack of

3   ownership of these copyrights is not going to

4   change until its conduct changes, and its conduct

5   is not going to change.  What Righthaven is doing

6   in this case and has been doing in other cases is

7   attempting to create an army of zombie lawsuits,

8   things that have been settled, things that have

9   been set aside, in an effort to undermine this

10  Court's principles of finality and of preclusive

11  effects, and of prejudice in order to keep these

12  lawsuits alive for whatever purpose it's

13  accomplished.

14                  These don't deserve to be alive.

15  They shouldn't be.  They should have all have

16  been dismissed, and in many cases they have been

17  resolved for a point of judgment, yet they are

18  being re-filed under the pretense, the mistaken

19  pretense, that changing an agreement after the

20  fact and after the rights have transferred

21  somehow changes the facts many years in the past.

22  The other problem is that even if Righthaven got

23  everything that it wanted, it wouldn't change the

24  fact that these lawsuits ignore important First

25  Amendment principles.

```
1                    Most importantly, every single
2   case where a motion for summary judgment has been
3   brought by counsel, I understand that in this
4   case it hasn't happened because the defendants
5   have been pro per, but when evidence is put on
6   the record, Righthaven has not won a single
7   dispute on fair use because it is not in the same
8   market as content producers, it is in the market
9   of lawsuits.  It is a separate market and unless
10  somebody else is claiming ownership of a
11  copyright and suing on it, it is not competing
12  with Righthaven.
13                    Allowing Righthaven to re-file
14  this lawsuit ignores that, and it also allows
15  them to continue on with this enterprise that
16  harms the First Amendment.  It puts people into
17  their basement where they're afraid to talk,
18  they're afraid to entrap one another, and they're
19  afraid to come out and to produce content because
20  it might infringe upon what somebody else has
21  done.  Moreover, and as we represent bloggers as
22  the Media Bloggers Association's counsel, we also
23  have to uphold the provisions of copyright
24  owners.
25                    Allowing Righthaven to continue
```

1    on with this lawsuit and to further amend its

2    complaint harms the interest of legitimate

3    producers of content who own their own content

4    and sue on their own content by retaining

5    attorneys rather than a complex transfer of

6    rights that doesn't transfer anything at all.

7    And Righthaven has done more damage to the

8    interests of intellectual property holders than

9    Perfect Ten, Incorporated, which has filed

10   numerous lawsuits and strengthened the provisions

11   of fair use and given more protections to website

12   operators and Internet hosts.

13            It is important to understand

14   the relationship within the copyright between

15   content producers and content consumers, however,

16   the way that this is being done ignores important

17   First Amendment principles, punishes the most

18   protected kind of speech that we have in public

19   forums, such as the Internet, about public

20   matters of policy, politics, and other issues of

21   debate and tries to commoditize (phonetic) them

22   in what Mr. Schultz characterized as a secondary

23   market for lawsuits.

24            The U.S. Government, it is to

25   nobody's surprise, heavily regulates these

1   secondary markets, and if it intended to create

2   one for copyrights, it would be reflected in the

3   Copyright Act.  To allow amendment of this and

4   for this lawsuit to persist and this model to

5   proliferate undermines these goals, harms the

6   court, harms producers, and it harms people who

7   are trying to exercise their free speech rights

8   guaranteed by the First Amendment.

9                    Thank you.

10          THE COURT:  Thank you.

11                    Ms. Cendali, now you can get a

12   chance to reply.

13          MS. CENDALI:  Thank you.

14                    I will attempt to respond

15   briefly to the gist of the comments.  First, if

16   there is a dismissal, we still believe that the

17   Court should grant our motion for leave to amend.

18   It clearly should be without prejudice.  All the

19   other dismissals in the other district courts in

20   this -- have ruled on this and have done it

21   without prejudice because that is what the law is

22   when it's simply an issue of standing and

23   jurisdiction that doesn't reach the merits.

24                    Second, there's no preclusive

25   effect here.  It's clearly the overriding

1    takeaway that I get from especially Mr. Pulgram's

2    argument is that the amici want to prevent this

3    court or any court from ruling on the third

4    version, the restated amendment, and that's

5    because conspicuously absent from their brief is

6    really any challenge to the third amendment of

7    the restated agreement as to why it doesn't

8    comply with Silvers.

9              No court has ruled on the

10   restated amendment.  That's the bottom line.

11   Because of that to deny us, Righthaven, the right

12   to file a new lawsuit based on a new agreement is

13   violation of due process and it fails the issue

14   preclusion requirement that there has to be an

15   identity of issues.  There's no identity of

16   issues between the restated amendment and the

17   original SSA (sic).

18              Moreover, the case that Mr.

19   Pulgram mentioned that he copied from Kinko's,

20   presumably heard about before and he sent it to

21   Kinko's for copying, was a summary judgment

22   decision where the court specifically said even

23   in the language read that there was a full

24   opportunity for the court to hear and understand

25   the issues before ruling.  This is a motion to

```
 1   dismiss.  They want to summarily adjudicate on a
 2   motion to dismiss fundamental property rights.
 3   That's antithetical to both the law and to the
 4   constitution.
 5                  That's a violation of due
 6   process and is not supported by any authority
 7   that I am aware of.  Moreover, conspicuously
 8   absent from their discussion of other cases is
 9   Judge Navarro's decision in Virginia Citizens,
10   and in that case Judge Navarro denied a motion to
11   dismiss and that was not either with regard to
12   the current restated amendment saying that they
13   pled that they had ownership rights and we'll
14   test it out in discovery and see.
15                  I suggest that Judge Navarro's
16   approach is also a very practical approach that
17   this Court should take.  She wrote a very recent
18   opinion.  We'd be happy to provide your Honor
19   with a copy of it if your Honor doesn't have it.
20   It said that, look, if there is an issue on this,
21   let's decide it, you know, after a full
22   development of the record.
23                  Finally, on the issue of the
24   amendment, counsel completely ignores a comment
25   that your Honor made which is that parties always
```

```
 1    have the right to amend and enter into new
 2    agreements, and this is something that the United
 3    States Supreme Court in Sprint Communications, a
 4    case cited in our recent brief, specifically said
 5    there, too -- it wasn't a copyright case, but it
 6    was a case similarly where somebody was -- there
 7    were aggregators who were suing on various
 8    collection cases.
 9                    And the Supreme Court said if
10    there was some issue with the assignment, the
11    parties could readily fix it by entering into a
12    new agreement.  So the Supreme Court certainly
13    believes in the freedom of contract and agrees
14    that you are not forever bound to whatever
15    agreement you may have entered into two years ago
16    and have no ability to change that agreement
17    based on guidance from the various courts.
18                    The other thing is that we've
19    heard from our opponents is a lot of talk about,
20    well, you know, you're bad, Righthaven, because
21    you want to file lawsuits and that's a bad thing.
22    And I think that counsel, with respect, totally
23    misconstrues the Silvers case and what it holds
24    because Silvers simply says if all you have is
25    the right to sue, you don't have the right to
```

1    sue.

2              What Silvers says is that as

3    long as you have any one of the exclusive rights

4    under the copyright law, you have the right to

5    sue that goes with that.  They're turning it on

6    its head and trying to say, well, you can't, your

7    purpose can't ever be as the copyright order to

8    file lawsuits, but Silvers said, look to patent

9    law.  Silvers in the key area of the case says

10   because patent law and copyright law are similar,

11   especially for issues of assignment, it's

12   instructive to look to patent law.

13              And when you look to patent law,

14   you look to what -- the case I believe is highly

15   on point here, which is the SGS Thomson case

16   versus International Rectifier cited in our

17   omnibus brief that we submitted in the course of

18   this briefing, and there Judge Michel, Chief

19   Judge Michel, writing for the federal circuit

20   rejected a very similar argument that you're

21   hearing the professor and others making here with

22   the idea that there's somehow something wrong

23   with exercising as part of your ownership rights

24   the right to bring a suit.

25              The federal circuit found that

1   the district court erred in granting summary

2   judgment on the grounds that the patent

3   assignment in issue was a sham because the sole

4   purpose was to facilitate litigation -- sole

5   purpose to facilitate litigation.  The federal

6   circuit held in so ruling the trial court ignored

7   the express language of the assignment and in

8   effect created a new requirement not found in any

9   case law that a patent assignment must have an

10  independent business purpose.

11              The motive or purpose of a

12  patent assignment is irrelevant to the assignee's

13  standing to enforce the assigned patent.  This is

14  the key language.  Even a motive solely or

15  expressly to facilitate litigation is of no

16  concern to the defendant and does not bear on the

17  effectiveness of the assignment citing the United

18  States Supreme Court language in discovery

19  records case.  So the idea that there's something

20  wrong with choosing as part of your ownership

21  rights to file lawsuits is fundamentally flawed.

22  And equally fundamentally flawed is the idea that

23  there's something noble about copying other

24  people's intellectual property on the Internet.

25              These cases will ultimately I

1  hope be decided on the merits where the court can

2  look at the facts and properly view under the

3  First Amendment analysis under the fair use test

4  and see whether, in fact, there's an

5  infringement.  I was taught if you're taking

6  somebody else's property wholesale, copying it in

7  toto, and using it for your own self and selling

8  ads to make money as a result of it, that's theft

9  and there's a right to bring that claim.

10          THE COURT:  How many times should you

11  be permitted to amend?

12          MS. CENDALI:  Well --

13          THE COURT:  I mean because, you know,

14  you want to amend your complaint, but we're on

15  the third amendment, frankly, aren't we?

16          MS. CENDALI:  We are, your Honor.

17          THE COURT:  I mean you understand what

18  I'm saying, you didn't amend the complaint, but

19  basically you did because you've amended the

20  agreement.  This is a third incarnation of the

21  agreement.

22          MS. CENDALI:  I don't see any reason to

23  have to amend after this point.

24          THE COURT:  I understand, but should it

25  be with prejudice or without prejudice because

1  you've had one bite at the apple, two bites at

2  the apple, and now you want a third bite of the

3  apple.

4          MS. CENDALI:  But there's been no --

5  there's been no judicial -- it would be -- it

6  would be --

7          THE COURT:  It would be, it's the third

8  amendment, isn't it?  I mean I know you haven't

9  amended the complaint three times, but you've

10  amended the contract three times -- two times.

11          MS. CENDALI:  But there's been no --

12  but there's been no judicial ruling as to whether

13  the amended contract provides standing.  They

14  can't have it two ways.  Look at it this way --

15          THE COURT:  No, but answer my question.

16          MS. CENDALI:  Okay.

17          THE COURT:  Right?  This is the

18  third -- I mean you had one amendment, now you've

19  amended it again.  I mean this is like amending

20  the complaint.  I mean somebody comes in and says

21  I want to amend my complaint.  All right, I'll

22  give you a chance to amend your complaint.  Okay,

23  now they come back.  It's still no good.  Well,

24  give me another chance.  Okay, here's another

25  chance.  And that's where we are, is it not?

1          MS. CENDALI:  There's only been a

2   single motion to amend before you, your Honor,

3   and --

4          THE COURT:  I know that.

5          MS. CENDALI:  But the point is they

6   can't have --

7          THE COURT:  But the point is -- the

8   point is you've amended the complaint, you've

9   amended the underlying contract, the Strategic

10  Alliance Agreement.

11          MS. CENDALI:  And we have the right to

12  do that under the Supreme Court's ruling.

13          THE COURT:  That's correct, but you've

14  amended that which in effect amends the complaint

15  because it changes the basis upon which the case

16  is brought.

17          MS. CENDALI:  Right, and if that's the

18  case --

19          THE COURT:  So there's one amendment,

20  two amendments, how many times do you get to

21  amend?

22          MS. CENDALI:  Your Honor, if we -- if

23  you -- they have just argued to you that you

24  should not consider the restated and amended

25  agreement because it wasn't in existence at the

```
1   time of the original --

2           THE COURT:  Well, I can't care what

3   they say.  I mean, right, you've amended it,

4   you've amended this case --

5           MS. CENDALI:  So if the restated if you

6   want to deem --

7           THE COURT:  You've amended this case

8   twice now.

9           MS. CENDALI:  And if you want to deem

10  the restated and amendment before the court, then

11  we should have a discussion right now as to

12  whether the restated and amended agreement is

13  valid under the Silvers test or not.  We believe

14  that it is valid.

15          THE COURT:  Well, we're here because

16  they're saying you still don't have standing.

17          MS. CENDALI:  Right, and what they have

18  not articulated any reason why version three does

19  not convey standing.  Your point in your

20  tentative was --

21          THE COURT:  Well, except they have.

22  What you're trying to do is reverse court

23  decisions.  Other courts have said, well, you

24  don't have any standing, and you say, well, okay,

25  let me work on this agreement.  Well, you still
```

```
 1   don't have any standing.  Okay, well, let me work
 2   on it some more.  So you're just trying to create
 3   jurisdiction and you want to amend to keep
 4   creating jurisdiction.
 5           MS. CENDALI:  Your Honor, all we're
 6   saying is that there has been no decision on
 7   version three of the agreement.  As a result of
 8   that, to prohibit us from ever re-filing this
 9   case --
10           THE COURT:  Well, you've got other
11   cases you've filed.  There are other cases,
12   aren't there?  Is that the end then, are there no
13   more Righthaven cases after this?
14           MS. CENDALI:  Well, your Honor, you
15   would have to decide that the restated version
16   three which wasn't in existence as of the time
17   the case was --
18           THE COURT:  And, in fact, contradicts
19   the terms of the original agreement.
20           MS. CENDALI:  It doesn't contradict the
21   terms of the original agreement.
22           THE COURT:  Well, sure it does because
23   it says we intend to assign all the rights.
24   That's not what -- that wasn't in the first
25   agreement.
```

1           MS. CENDALI:  But that's consistent,

2      there's no contradiction.

3           THE COURT:  Well, sure, so then I don't

4      need -- then we don't need to have the amendment

5      because if there's no contradiction, then that's

6      the same agreement.  I've got the same agreement

7      in front of me I had before then.

8           MS. CENDALI:  Your Honor, there has --

9      on jurisdiction and standing there is no basis

10     for a decision --

11          THE COURT:  Well, no, no, you said

12     there's no contradiction.  There is a

13     contradiction.

14          MS. CENDALI:  There's not a

15     contradiction.  The intent of the parties was

16     always to --

17          THE COURT:  But the intent of the

18     parties is what they express.  We don't say, now

19     what did you intend?  Well, I intended really to

20     create a brand new hamburger to sell to

21     McDonald's.  Well, that's not what your agreement

22     says.  Well, that's what I intended.  And so the

23     intent of the parties is what they express.

24               They can't say, well, no, I know

25     what we said.  I know we said that we were going

1  to create a car, build a car, but I meant to --

2  what we intended was I was going to create a

3  hamburger.  Well, I don't care what you say your

4  intent is, does it square with what the terms of

5  the agreement are?

6           MS. CENDALI:  And it does, your Honor.

7           THE COURT:  And it doesn't because you

8  didn't have the right to sue -- I'm sorry --

9  that's all you had was the right to sue.  You

10 didn't have the underlying copyright.

11          MS. CENDALI:  That's apparently your

12 view with regard to the original --

13          THE COURT:  Well, let's see, let me

14 call Judge Hunt and see if he agrees, and Judge

15 Dawson and see if he agrees, and Judge Whoever

16 and see if they agree.

17          MS. CENDALI:  But now we're talking

18 about the version three.

19          THE COURT:  No, now we're talking about

20 how that contradicts the first two.

21          MS. CENDALI:  It doesn't contradict it,

22 it amends it.  It changes it, it's a new set of

23 facts.

24          THE COURT:  It contradicts it.  It

25 doesn't contradict it so that you always have the

```
 1   right -- that you had all of the rights under the

 2   copyright law, right, and you always had that.

 3   Why did you amend it then?  Why did you amend it

 4   once?  Why did you amend it twice if you already

 5   had those rights?  There's no need to amend it,

 6   is there?

 7             MS. CENDALI:  We amended it because

 8   other courts have found that there was a problem

 9   with standing under the original and under the

10   second version and in order to moot any issue --

11             THE COURT:  Well, what did they find?

12   They found based on the language of the contract.

13             MS. CENDALI:  Under the first and the

14   second but not the third.

15             THE COURT:  Exactly, contradicted.

16   This contradicts the terms of the first and the

17   second.

18             MS. CENDALI:  But no court found

19   anything with regard to the third, your Honor,

20   and that's the key point.

21             THE COURT:  But this contradicts the

22   terms of the first and the second, does it not?

23             MS. CENDALI:  No, it doesn't, it

24   changes it.

25             THE COURT:  Well, sure it does.  It
```

```
1    does because you didn't have these rights,
2    otherwise, why would you amend it if it didn't
3    contradict them?  You're contradicting it to try
4    to give us jurisdiction.  That's the only reason
5    you're amending it.  So let's amend it again,
6    let's amend it again.  Does it contradict?  Of
7    course, it does because under the first agreement
8    you didn't have any right to -- you didn't have
9    all the copyright rights that you are supposed to
10   have.  So then we'll change it.  So you changed
11   it.  That contradicts the terms of the first,
12   doesn't it?  Yes, it does, yes, it does.
13             MS. CENDALI:  It changes the change of
14   the first.
15             THE COURT:  Yes, it does, it does.
16             MS. CENDALI:  It changes the terms of
17   the first absolutely.
18             THE COURT:  It absolutely contradicts
19   it.
20             MS. CENDALI:  It's absolutely different
21   from the change of the first.
22             THE COURT:  Well, thank you, finally.
23             MS. CENDALI:  So it totally changes the
24   terms of the first agreement.
25             THE COURT:  And the second.
```

1              MS. CENDALI:  And the second.

2              THE COURT:  That's right.

3              MS. CENDALI:  Absolutely, and so the

4    point is that third agreement has not been ruled

5    on.

6              THE COURT:  The point is you've already

7    amended it twice.  You're saying let me amend it

8    again, let me amend it again.  What about the

9    formation of Righthaven where counsel tells me

10   that in the formation documents they agree that

11   at the end of the litigation the copyright gets

12   returned to Stephens Media.  That contradicts the

13   terms of the third agreement.

14             MS. CENDALI:  No, it doesn't contradict

15   the terms of the third agreement.  Right now the

16   only party with standing to sue is Righthaven

17   because Stephens Media only has a nonexclusive

18   license to use the copyright.  So if you were to

19   decide that Righthaven had no ability even under

20   a new agreement that was not originally before --

21             THE COURT:  But answer my question.  I

22   can tell you're a lawyer.  You know, yeah, the

23   parameters of the paradigm are such that the

24   confluence of factors bearing on the -- what?

25   What in the world are you saying?  Answer my

1   question.

2            MS. CENDALI:  What's you question, your

3   Honor?

4            THE COURT:  Should I have the court

5   reporter read it back?  I mean obviously you

6   weren't listening I guess.

7            MS. CENDALI:  Forgive me, I don't

8   understand it.

9            THE COURT:  What about the formation

10  documents of Righthaven?

11           MS. CENDALI:  Right.  The formation

12  documents of Righthaven --

13           THE COURT:  They say that at the end of

14  litigation then the copyright reverts back to

15  Stephens Media.

16           MS. CENDALI:  Right, and that is not

17  antithetical with the -- in the SGS case, the

18  federal circuit case that I was discussing

19  earlier, the federal circuit said the fact that

20  an assignment provides for a right of reversion

21  does not mean that it's not a bona fide

22  assignment that gives the right to sue.  They

23  have cited no case law that that provision in the

24  operating agreement means that Righthaven --

25           THE COURT:  But I mean what we've got

```
 1   here are a series of amendments just trying to
 2   give us jurisdiction.  That's the way it seems to
 3   me.  I mean there's no other reason for these
 4   amendments other than to try to create
 5   jurisdiction.
 6              MS. CENDALI:  But the fundamental
 7   business deal has changed, it used to -- that the
 8   original agreement Righthaven got much narrower
 9   rights.  Now, under the new agreement it has all
10   right, title, and interest.  Stephens Media only
11   has a nonexclusive right to use, which doesn't
12   even give it standing to sue.  The copyright law
13   is clear that there's no standing to sue under
14   those circumstances.
15                   Stephens Media has no ability to
16   make decisions on who can file a lawsuit or when.
17   It has no ability to get the copyrights back
18   whenever it wants it.  All the -- if you look at
19   the Silvers case and the Nafal case and the cases
20   that find it, under all the decisions in that
21   case under the third agreement, there's clearly a
22   grant of copyright to Stephens -- to Righthaven
23   and with it the right to sue.
24              THE COURT:  All right, I'm going to
25   grant the motion to dismiss, but it's always my
```

```
 1   preference to do it without prejudice.  So I'm
 2   giving you -- but I'm telling you I'm running out
 3   of patience with all of these amendments.  Now,
 4   understand and don't be technical and say, oh, we
 5   haven't amended the complaint before.  In effect
 6   you have by amending the Strategic Alliance
 7   Agreement, the agreement on which the lawsuit is
 8   based.  So there we are.  So I'll dismiss it
 9   without prejudice.
10           MS. CENDALI:  Thank you, your Honor.
11           MR. PULGRAM:  Could I have twenty-two
12   seconds, your Honor?
13           THE COURT:  Twenty-two, you got it.
14   And understand it's just -- I want people to have
15   their day in court.
16           MR. PULGRAM:  And we appreciate that,
17   your Honor, you've been very generous.
18           THE COURT:  And understand, too, none
19   of us has focused on this third incarnation, and
20   it may be Casper, the friendly ghost, or I don't
21   know what it is, but, you know, I'm just
22   reluctant to say, no, you are out of time, you're
23   out of luck.
24           MR. PULGRAM:  Then I'll take one minute
25   and twenty-two seconds.
```

```
 1                 THE COURT:  Okay.
 2                 MR. PULGRAM:  All right, first with
 3      respect to the third amendment, there are two
 4      ways and two reasons why it doesn't matter.  The
 5      first is that there's already a judgment that the
 6      SAA did not create standing.  That is collateral
 7      estoppel.  Now, the point I stood up to make is
 8      this, counsel stated that the dismissals by the
 9      other courts on the standing issue were -- was,
10      quote, without prejudice and with leave to amend.
11                 I suggest that those decisions
12      be reviewed because they do not say that the
13      dismissal was without prejudice.  They do not say
14      that it was with leave to amend.  They say I
15      dismissed because there was no standing because
16      there was no ownership and as we looked at the
17      case earlier, that is a dismissal with prejudice
18      on the merits.  And so that's reason one why you
19      don't get to the third agreement at all.  This is
20      over.  It's been decided.  And the second
21      reason --
22                 THE COURT:  Wait, wait, let me stop you
23      right there.
24                 MR. PULGRAM:  Yes, yes.
25                 THE COURT:  One thing you don't want to
```

```
 1   do is mislead a judge.
 2            MR. PULGRAM:  Absolutely.
 3            THE COURT:  You told me these were
 4   without prejudice these other dismissals.  I mean
 5   I've got this other case and these people have
 6   been waiting patiently to --
 7            MS. CENDALI:  Your Honor, if this is
 8   helpful, under Federal Rule of Civil Procedure
 9   41, in voluntary dismissals for lack of
10   jurisdiction is deemed a dismissal without
11   prejudice unless the court expressly states
12   otherwise.  That's what Federal Rule of Civil
13   Procedure 41 says.  There's nothing as far as I
14   know in any of these opinions that says, that
15   states, that it's with prejudice.
16            THE COURT:  Well, you didn't say that
17   before, did you?
18            MS. CENDALI:  So that's --
19            THE COURT:  You didn't say that before,
20   did you?
21            MS. CENDALI:  I did --
22            THE COURT:  You did not say that
23   before, did you?  Rule 41 says that, you didn't
24   tell me that before.  You're relying on Rule 41,
25   is that what you're telling me now?
```

1          MS. CENDALI:  Yes, it's none of them

2     say they're with prejudice, that means they are

3     without prejudice.

4          THE COURT:  You didn't say that before.

5     You said these are dismissals without prejudice.

6     So I'm looking here to see were they without

7     prejudice or with prejudice and you're saying,

8     well, no, I'm relying on Rule 41.  Why didn't you

9     tell me that before?  All right, go ahead.

10          MR. PULGRAM:  So Rule 41 is not the

11    rule that applies when you have a determination

12    of standing and ownership which is a

13    determination on the merits.

14          THE COURT:  I understand.

15          MR. PULGRAM:  Second, regardless of the

16    fact that these agreements are completely -- that

17    these amendments are foreclosed by the prior

18    decisions, we've gone through the reasons why all

19    of those contradictions mean they can't state a

20    claim.  And, therefore, it should be with

21    prejudice so we don't have to come in here and do

22    this again.  Thank you, your Honor.

23          THE COURT:  I appreciate it.  And again

24    my preference is just I want to be sure that

25    everybody gets their day in court and that we

1  have and full and fair hearing.  None of us has

2  really focused -- and by that I mean the parties

3  either.  I mean you've discussed it more than any

4  of the courts have, but it's just I want

5  everybody to have a fair shake at it.

6                      So I'm going to order this

7  dismissal without prejudice, all right?

8              MS. CENDALI:  Thank you, your Honor.

9              THE COURT:  Thank you.  We'll in be

10  this recess.  Oh, Mr. Pulgram, now let me put the

11  burden on you to prepare an appropriate order if

12  you would, please.

13             MR. PULGRAM:  We will, your Honor.

14             THE COURT:  And I realize it's not

15  your -- your preference was with prejudice, but

16  prepare an appropriate order and submit that, if

17  you would, please.

18             MR. MANGANO:  Could I review that?

19             THE COURT:  Pardon me?

20             MR. MANGANO:  Could I review that

21  before it's submitted?

22             THE COURT:  Yeah, but understand they

23  win, they prevailed.  So I mean I'm not going to

24  say, oh -- I mean I won't let them misstate

25  anything, but I'm not inclined to give you a lot

1    of leeway.

2            MR. MANGANO:  No, I understand.

3            THE COURT:  But, yeah, run it by Mr.

4    Mangano, please.

5

6        (Whereupon, the proceedings concluded.)

7

8

9

10

11            I hereby certify that pursuant

12   to Section 753, Title 28, United States Code, the
     foregoing is a true and correct transcript of the

13   stenographically reported proceedings held in the
     above-entitled matter.

14

15   Date:  August 29, 2011        /s/ Joy Garner
                                    JOY GARNER, CCR 275

16                                  U.S. Court Reporter

17

18

19

20

21

22

23

24

25